**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| **DIGITAL ALLY, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-02026-DDC-GLR** |
| **DANIEL CORUM,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Digital Ally, Inc. brings this lawsuit against defendant Daniel Corum, its former employee. Mr. Corum now works for plaintiff's competitor, TASER International, Inc. ("TASER"),[1] asserting claims of tortious interference, breach of contract, and violation of the Kansas Uniform Trade Secrets Act. This matter comes before the court on plaintiff's Motion for Temporary Restraining Order[2] and for Preliminary Injunction (Doc. 5). On February 24, 2017, the court conducted an evidentiary hearing on the motion. After considering the evidence, submissions, parties' arguments, and parties' supplemental briefs, the court is now prepared to rule. For reasons explained below, the court denies plaintiff's Motion.

### I.     Factual Background

Plaintiff is a 150-employee company that specializes in manufacturing video recording devices. Plaintiff sells these devices to law enforcement departments and other commercial users

---

[1]      TASER International, Inc. now does business as Axon. For consistency with the parties' briefing, the court refers to Mr. Corum's employer as TASER.

[2]      Plaintiff titles its Motion "Motion for Temporary Restraining Order and Preliminary Injunction." Doc. 5. But, its motion does not comply with the rules set out in Fed. R. Civ. P. 65(b). And, plaintiff's memoranda in support of the motion focuses almost entirely on a request for a preliminary injunction. The court thus considers and rules on plaintiff's motion as one seeking a preliminary injunction only. To the extent that plaintiff intends for its motion to seek a temporary restraining order, the court denies it.

like taxicab and private ambulance companies.  Plaintiff's cameras can be embedded in its clients' rearview mirrors or worn on a person's body.  According to plaintiff, a unique feature of some of plaintiff's cameras enables them to turn themselves on automatically.  Plaintiff calls this technology "VuLink."  The VuLink camera reacts to a specific triggering event such as an officer drawing a weapon or turning on a siren.  When the triggering event occurs, the camera begins to record automatically without any direction by the law enforcement officer.

Plaintiff employed Mr. Corum from December 7, 2015 to August 16, 2016.  Mr. Corum worked in a sales and support oriented role working primarily with plaintiff's prospective commercial clients.  Mr. Corum's role never changed during the eight months he worked for plaintiff.  Mr. Corum contends he never worked with any of plaintiff's law enforcement clients.

Plaintiff gave Mr. Corum two weeks of general training when he started working.  As part of his employment, Mr. Corum signed an employment contract that included a covenant not to compete ("the agreement").  This agreement provided that:

> The Employee acknowledges that during Employee's employment with Digital Ally, Employee, at the expense of Digital Ally, will be specially trained in Digital Ally's business, will establish favorable relations with Digital Ally's customers, clients, accounts and vendors and will use and have access to Digital Ally's Trade Secret Information;
>
> In consideration of such training, relations and access, and to further protect Digital Ally's Trade Secret Information and other confidential information, Employee agrees that during the term of Employee's employment by Digital Ally, and for a period of two years from and after the voluntary or involuntary termination of such employment, for any or no reason, employee will not directly or indirectly, without the express written consent of Digital Ally, except when and as directed to in the performance of employee's duties under this agreement:
>
> Own, manage, operate, control or have any interest, financial or otherwise, in or act as an officer, director, partner, principal member, manager, shareholder, employee, agent representative,

consultant or independent contractor of, or in any way assist any person or entity in the conduct of any business or enterprise which competes with the digital and electronic products of Digital Ally. Digital Ally sells and distributes its products throughout the United States and internationally;

Directly or indirectly solicit or divert, or attempt to solicit or divert, any customer, clients, or accounts of Digital Ally;

Directly or indirectly use or disclose to any person, firm, or corporation, the names or addresses of any of the customers, clients or accounts of Digital Ally.

Doc. 8 at 4.

In August 2016, Mr. Corum quit his job with plaintiff to work for plaintiff's competitor, TASER. Mr. Corum currently works remotely for TASER from his home in Springfield, Missouri, as a network technician. As a network technician, Mr. Corum is responsible for implementing TASER's "Fleet" system in its law enforcement clients. The Fleet system is an in-vehicle recording device. Mr. Corum described his role at TASER as an "advisor to law enforcement departments who are existing TASER clients." Doc. 7 at 4. In other words, Mr. Corum helps TASER clients increase the number of Fleet systems used in their department vehicles. Third parties manufacture the routers that support the Fleet system. In his role, Mr. Corum also serves as the liaison between the client and the third-party router manufacturer. Mr. Corum does not make sales of TASER's products

Plaintiff and TASER are involved in a separate lawsuit about plaintiff's VuLink technology. Plaintiff sued TASER claiming patent infringement, commercial bribery, and unfair/anti-competitive acts or practices—all relating to the auto-activation technology. This case is still pending before Judge Murguia of our court.

Here, plaintiff claims Mr. Corum breached the employment contract he signed when he began working for plaintiff. Plaintiff seeks a preliminary injunction preventing Mr. Corum from

providing TASER services.  Specifically, plaintiff seeks an injunction:  (1) prohibiting Mr. Corum from using any confidential information he learned working for plaintiff to compete with plaintiff unfairly; (2) requiring Mr. Corum to return all the confidential information he has in his possession; (3) prohibiting Mr. Corum from selling or attempting to sell TASER products similar to its products to plaintiff's customers; and (4) prohibiting Mr. Corum from continuing to work for TASER.

## II.    Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes district courts to issue preliminary injunctions.  The relief afforded under this rule has a limited purpose—a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  To prevail on a motion for preliminary injunction, the movant must demonstrate that:  (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction, if issued, will not be adverse to the public interest.  *Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

Whether to grant a preliminary injunction rests within the court's sound discretion. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). But, a preliminary injunction is an extraordinary remedy.  *Winter*, 555 U.S. at 24.  So, the right to such relief must be "clear and unequivocal."  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics, USA, Inc.*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp. v. Urban Gorilla, LLC*,

500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.     Analysis

Plaintiff seeks an injunction that:  (1) prohibits Mr. Corum from using confidential information he learned working for plaintiff to compete with plaintiff unfairly; (2) requiring Mr. Corum to return any of plaintiff's confidential information in his possession; (3) prohibiting Mr. Corum from selling or attempting to sell similar products to plaintiff's customers; and (4) prohibiting Mr. Corum from continuing to work for TASER.

"[C]ourts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'"  *Dominion Video Satellite v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260–61 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).  The court thus begins the analysis by asking whether plaintiff will suffer irreparable harm without the injunction it seeks.

### A.  Irreparable Harm

Irreparable harm "'does not readily lend itself to definition.'"  *Id.* at 1262 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).  And proving irreparable harm is not "'an easy burden to fulfill.'"  *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  So, to "constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C.

Cir. 1985)). "Irreparable harm is not harm that is merely serious or substantial." *Id.* (citations and internal quotation marks omitted).

Instead, a plaintiff establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258). A claim of "purely speculative" harm will not suffice; instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden. *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1260)). Moreover, wholly conclusory statements do not amount to irreparable harm. *Dominion Video*, 356 F.3d at 1261. The court must determine if the irreparable harm theorized by plaintiff's injunction motion is likely to take place before a ruling on the merits. *RoDa Drilling Co.*, 552 F.3d at 1210 (quoting *Greater Yellowstone*, 321 F.3d at 1260)).

A plaintiff may establish irreparable harm by "such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position." *Dominion Video*, 256 F.3d at 1264; *see also Hill's Pet Nutrition, Inc. v. Nutro Prod., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003) ("[L]oss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." (citations and internal quotation marks omitted)).

Here, plaintiff asserts it will suffer irreparable harm without an injunction because it will lose its competitive market position. As support, plaintiff relies on *Advisors Excel, LLC v. Zagula Kay Consulting, LLC*, No. 15-4010-DDC-KGS, 2015 WL 736344, at *1 (D. Kan. Feb. 20, 2015). In *Zagula*, this court issued a preliminary injunction, in part, because the plaintiff produced sufficient evidence to show that it would suffer an irreparable harm if the injunction

did not issue. *Zagula*, 2015 WL 736344, at *1, *3–*4. Like plaintiff in this case, the *Zagula* plaintiff asserted that they would lose competitive market position. *Id.* at *4. The *Zagula* plaintiff demonstrated that the defendant planned to recruit some of its employees to a new competing business. *Id.* And the *Zagula* plaintiff also cited specific examples in its industry where a company recruited one of its competitor's employees and the recruitment "snowballed," causing other employees to follow suit. *Id.* By citing examples, the *Zagula* plaintiff demonstrated that the snowballing threat was real, "not just a theoretical or speculative possibility." *Id.* (citing *Heideman v. S. Salt Lake Cty.*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

In contrast, plaintiff here relies just on a theoretical or speculative possibility that it will suffer loss of customers, goodwill, and threats to business viability if the injunction does not issue. Unlike *Zagula*, plaintiff has produced no evidence that Mr. Corum planned to recruit any of plaintiff's employees. Nor has plaintiff produced evidence that leads the court to conclude that a real threat of snowballing exists. In its supplemental brief, plaintiff asserts that Mr. Corum admits he was recruited to TASER by a "head hunter" while working for plaintiff. Doc. 17 at 5. But at the February 24 hearing, Mr. Corum testified that he sought out the third party recruiter who sent him to TASER. At the February 24 hearing, Stanton Ross, plaintiff's CEO, testified that some of plaintiff's employees have been contacted by TASER. But Mr. Ross's testimony did not identify any specific examples when other employees have left plaintiff to work for TASER—other than Mr. Corum. So, no evidence of a real threat of "snowballing" exists in the record.

Plaintiff also attempts to show irreparable harm by emphasizing the tight competition between it and TASER. In its supplemental brief, plaintiff contends this "is not a case in which a former employee has chosen to work [for] another entity," but one where an employee has

"change[d] uniforms" in a "war." *Id.* 17 at 16. Plaintiff asserts that TASER has managed to

make itself competitive in the market only by infringing on two of its patents (the issue being

litigated before Judge Murguia). And, plaintiff asserts Mr. Corum knows of its trade secrets that

he could divulge to TASER and provide it with an unfair competitive edge. *Id.* at 15. It appears

plaintiff is trying to establish irreparable harm by suggesting that Mr. Corum's employment with

TASER is part of the reason TASER has excelled quickly in the body camera market. But

plaintiff has adduced no evidence linking Mr. Corum's work for plaintiff to the devices at issue

in the patent litigation. Mr. Corum worked in a sales role for commercial clients while employed

by plaintiff, and he now works as a networking technician for TASER's law enforcement

clients.[3] Plaintiff cannot demonstrate the irreparable harm necessary to enforce a preliminary

injunction merely by asserting that Mr. Corum left to work for its competitor. Wholly

conclusory and speculative statements, no matter how vividly argued, do not amount to

irreparable harm.

The fact that plaintiff and TASER are marketplace competitors might have justified a

preliminary injunction that prohibits Mr. Corum from using confidential information to compete

unfairly with plaintiff or ordering Mr. Corum to return confidential information that he has in his

possession. But plaintiff has not sustained its burden to show that Mr. Corum possesses any

confidential information, or that he is using that confidential information to compete with

plaintiff. In sum, plaintiff has not met its burden to demonstrate that it will suffer irreparable

harm without an injunction.

---

[3]     Mr. Corum has produced a declaration from Alissa McDowell, the Contracts Manager for TASER, on this point. Ms. McDowell asserts that TASER does not have commercial clients such as taxicab companies and private ambulance services. Mr. Corum worked exclusively with plaintiff's taxicab and private ambulance company customers.

## B. Balancing Harms

Because plaintiff fails to carry its burden to show that it will suffer irreparable harm, plaintiff has not shown that any harm it will sustain outweighs the harm to Mr. Corum if the court issues an injunction. Plaintiff asserts that, it will sustain harm without an injunction because Mr. Corum has the ability to employ its trade secret information to help TASER compete unfairly with plaintiff. According to plaintiff, this outweighs any potential harm to Mr. Corum.

Indeed, the harms plaintiff cites might justify entering an injunction that prohibits Mr. Corum from using any of plaintiff's confidential information to compete with plaintiff unfairly. But plaintiff has adduced no evidence that Mr. Corum possesses any of its trade secrets from his time working in a sales and support role with plaintiff. And, even if he does possess such information, plaintiff has not shown that Mr. Corum could use the information to TASER's advantage in his role as a network technician.[4] The fact that TASER is plaintiff's competitor and threatens plaintiff in the competitive marketplace does not, without more, tip the balance of harms to favor plaintiff.

In contrast, Mr. Corum cites specific hardships that an injunction, if granted, would inflict on him. Specifically, Mr. Corum asserts that prohibiting him from working for TASER will deprive him of the income that he uses to support his family while he endures the rest of this litigation or looks for another job. And, Mr. Corum contends that the "vague and inconsistent limitations" contained in the employment agreement under the requested injunction would make it difficult to find another job. *Id.* at 18–19. Mr. Corum also contends that the harms he cites

---

[4] Mr. Corum has produced a declaration from Tom Lincks, the Customer Support Manager for TASER, on this point. Mr. Lincks asserts that "Mr. Corum's role with TASER is such that he does not have the opportunity or ability to convey or benefit from [plaintiff's] trade secret information, even if he had such information in his possession." Doc. 7-2 at 3.

cannot be undone if he prevails in the lawsuit. According to Mr. Corum, the Information

Technology ("IT") marketplace is constantly evolving, and prohibiting Mr. Corum from working

for TASER during the lawsuit would make it unlikely that he would be able to return to his job.

Finally, Mr. Corum asserts that the injunction will affect him on a personal level by limiting the

time he can spend with his daughter. His work for TASER allows Mr. Corum ample time to

spend with his young daughter. He asserts that he could not derive the same benefit from a

position with another company. Mr. Corum asserts that plaintiff's speculative harm does not

outweigh the "certain and substantial harm" he will suffer if the injunction issues. Doc. 7 at 19.

The court agrees. Plaintiff has not demonstrated more than theoretical or speculative harm.

In sum, plaintiff has not met its burden to demonstrate that the balance of harms favors

entering an injunction.

### C. Public Interest

Plaintiff contends granting an injunction services the public interest for two reasons.

First, because "there is a public interest in upholding enforceable contracts." *Universal*

*Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1149–50 (D. Kan. 2007). Indeed, plaintiff

asserts that Kansas long has recognized a public interest in promoting freedom to contract and

this interest supports entering a preliminary injunction. Doc. 12 at 18–19. Second, plaintiff

contends Kansas has an interest in "rigorously" protecting trade secrets." *Id.* at 19–20. Plaintiff

relies on the Kansas Uniform Trade Secrets ACT ("KUTSA") as support for this position. *See*

Kan. Stat. Ann. § 60-3320 to 3327. The KUTSA provides that "[a]ctual or threatened [trade

secret] misappropriation may be enjoined." Kan. Stat. Ann. § 60-3321(a).

In contrast, Mr. Corum contends that issuing a preliminary injunction here would

contradict the public interest by restraining his right to exercise his trade. Doc. 7 at 20. While

Mr. Corum concedes his right is not absolute, he contends it should prevail in this case because the agreement is not enforceable under Kansas law.

Because the parties disagree whether the contract is enforceable, the court does not decide this issue and instead turns to plaintiff's likelihood of success on the merits.

### D.  Likelihood of Success on the Merits

The Tenth Circuit generally uses a liberal standard for "probability of success on the merits." *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1148 (D. Kan. 2007).  But, the Tenth Circuit disfavors three kinds of injunctions and thus those injunctions are subject to a heightened burden of proof.  *Id.* at 1150 (D. Kan. 2007).  Under this standard, the movant must make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Id.*  These heightened standard injunctions are:  "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  *Id.*  The Tenth Circuit describes mandatory injunctions as injunctions that "affirmatively require the nonmovant to act in a particular way."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005).

Plaintiff's Motion requests an injunction that orders four things:  (1) prohibiting Mr. Corum from using any confidential information he learned working for plaintiff to compete with plaintiff unfairly; (2) requiring Mr. Corum to return all the confidential information he has in his possession; (3) prohibiting Mr. Corum from selling or attempting to sell similar products to plaintiff's customers; (4) prohibiting Mr. Corum from continuing to work for TASER.  Mr. Corum contends that plaintiff's fourth request—prohibiting him from continuing to work for TASER—makes plaintiff's request here a motion seeking a mandatory preliminary injunction

because the requested relief requires Mr. Corum to "take the affirmative act of leaving his employment with TASER." Doc. 7 at 8. The court agrees, and thus subjects plaintiff's request for a mandatory injunction to a heightened standard. Before the court could issue an order requiring Mr. Corum to end his employment, plaintiff must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Duarte*, 519 F. Supp. 2d at 1150.

Plaintiff's motion for a preliminary injunction is based on its breach of contract claim for the non-compete and non-disclosure agreement between it and Mr. Corum. Under Kansas law, to establish likelihood of success on a claim for breach of a non-compete or non-solicitation contract, plaintiff must show: (1) the existence of a contract, (2) sufficient consideration to support the contract, (3) plaintiffs' performance or willingness to perform in compliance with the contract, (4) defendant's breach of the contract, and (5) damages to plaintiffs caused by the breach. *Navair, Inc. v. IFR Americas, Inc.*, 519 F.3d 1131, 1137 (10th Cir. 2008).

## 1. Existence of a Contract

First, Mr. Corum asserts that no enforceable contract exists because: (1) it is not supported by sufficient consideration, (2) it was not made ancillary to an employment contract, and (3) it is not reasonable under the circumstances.

### a. Consideration

Mr. Corum asserts the agreement was not supported by sufficient consideration because he worked for plaintiff for more than three months before executing it. Mr. Corum contends that he must have been "retained, promoted and entrusted with company secrets for a significant time after execution of such covenant[s]" to have received a benefit that he was not already entitled to recieve. Doc. 7 at 22 (quoting *Puritan-Bennett Corp. v. Richter*, 657 P.2d 589, 592 (Kan. Ct.

App. 1983)). Mr. Corum asserts that the record does not reflect any raise or promotion, and that he was not entrusted with any company secrets after signing the agreement. According to Mr. Corum, the agreement thus is unenforceable because it is not supported by consideration.

But Mr. Corum only cites one case to support his proposition, *Puritan-Bennett Corporation v. Richter*. There, the Kansas Court of Appeals held that "continued employment should not as a matter of law be disregarded as consideration sufficient to uphold a covenant not to compete." *Richter*, 657 P.2d at 592. In *Richter*, the Kansas Court of Appeals discussed how "[w]ithout doubt, employers rely on the continued loyalty of an employee as signified by his signature on a covenant not to compete in dispensing responsibility and rewards." *Id.* Though the parties disagree about whether plaintiff was given access to trade secrets, it is uncontroverted that Mr. Corum continued to work for plaintiff for eight months after he signed the agreement. And whether continued employment amounts to sufficient consideration is a question of fact. *Id.* The court thus concludes that plaintiff has carried its burden to show at least a sufficient likelihood of success proving that the agreement is supported by sufficient consideration.

### b. Ancillary to an Employment Contract

Mr. Corum next contends the agreement is unenforceable because it was not made ancillary to an employment contract. The Supreme Court of Kansas has held: "A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint on competition is reasonable under the circumstances and not adverse to the public welfare." *Weber v. Tillman*, 913 P.2d 84, 89 (Kan. 1996). Mr. Corum asserts that the agreement in this case was not executed ancillary to an employment contract because Mr. Corum had already been working for plaintiff for three months when he signed it, and the agreement specifically states in Section 2 that it is not a contract of employment. Doc. 1-1 at 25. Mr.

Corum never discusses, however, the legal implications if the agreement was not executed ancillary to an employment contract.

Plaintiff contends that the agreement was ancillary to an employment contract because Mr. Corum was employed for 90 days as a temporary employee, effective August 24, 2015. Then, at the end of the 90 day period, plaintiff offered Mr. Corum a salaried position which he accepted in writing. According to plaintiff, one condition of the employment offer was that Mr. Corum signed the agreement. Mr. Corum then signed the agreement the same day he accepted plaintiff's offer.

The court thus concludes that plaintiff has carried its burden to show at least a sufficient likelihood of success in proving that the agreement was executed ancillary to an employment contract.

### c. Reasonable

Finally, Mr. Corum contends that the agreement is not enforceable because it is not reasonable under the circumstances. Kansas courts will only enforce non-compete provisions "if the restraint is reasonable under the circumstances and not adverse to the public welfare." *Tillman*, 913 P.2d at 89. Kansas law establishes no rigid factors to use to evaluate a non-compete provision's reasonableness. *Id.* at 90. But it does guide the court to ask these questions: (1) does the non-compete provision protect a legitimate business interest of the employer? (2) Does the non-compete provision create an undue burden on the employee? (3) Is the non-compete provision injurious to the public welfare? (4) Are the time and territorial limitations contained in the non-compete provision reasonable? *Id.* at 90. The court must decide a provision's reasonableness based on the particular facts and circumstances of each case. *Id.*

i.  Plaintiff's Legitimate Business Interests

The Kansas Court of Appeals has held that only a "legitimate business interest may be protected" by a non-compete provision.  *Wichita Clinic, P.A. v. Louis*, 185 P.3d 946, 952 (Kan. Ct. App. 2008).  "If the sole purpose [of the non-compete provision] is to avoid ordinary competition, it is unreasonable and unenforceable."  *Id.* Kansas courts have recognized that customer contacts, special training of employees, trade secrets, confidential business information, loss of clients, good will, and reputation all qualify as legitimate business interests. *Tillman*, 259 Kan. 467 (Kan. 1996).  Courts will also consider "the reasonableness of the time and territory restrictions" in evaluating the legitimate business interests of the employer.  *Id.*

Plaintiff claims the agreement protects legitimate business interests like trade secrets, confidential business information, goodwill, commercial reputation, customer contacts, and customer relationships.  Plaintiff also claims the agreement prevents the employee from using "expertise gained during the term of his [ ] employment to benefit a competitor."  Doc. 17 at 15. To support this proposition, plaintiff contends that Mr. Corum gained all of his skills and experience in sales and video equipment installation during his employment at Digital Ally. Through his work there, plaintiff contends, Mr. Corum has knowledge of Digital's confidential information and trade secrets because he has addressed customer complaints about plaintiff's devices.

There is little question that the interests plaintiff asserts it is trying to protect through the agreement are legitimate business interests.  Kansas law recognizes the propriety of customer contacts, trade secrets, and confidential business information.  But Mr. Corum contends that the agreement, as it is written reaches too far, protecting more than legitimate business interests. The agreement also insulates plaintiff, Mr. Corum contends, from ordinary competition.  Kansas

15

courts are clear: "[R]estrictions must be no greater than necessary to protect the employer's interests." *Allen, Gibbs & Houlik, L.C. v. Ristow*, 94 P.3d 724, 729 (Kan. Ct. App. 2004). And, Kansas courts examine not whether the agreement protects legitimate business interests generally, but rather, whether the agreement protects legitimate business interests as applied to Mr. Corum. *See Ristow*, 94 P.3d 724 at 728 (determining whether the special training and knowledge acquired by a particular employee qualified as a legitimate business interest). Indeed, the Kansas Court of Appeals has held that a "person who leaves the employment of another has the right to take with him all the skill he has acquired, all the knowledge that he has obtained, and all the information that he has received, so long as nothing is taken that is the property of the employer." *Id.* (citing *Garst v. Scott*, 114 Kan. 676, 679 (Kan. 1923)). "All that knowledge, skill and information, except trade secrets, become a part of his equipment for the transaction of any business in which he may engage." *Id.*

Plaintiff has adduced no evidence here suggesting that enforcing the agreement will protect business interests such as trade secrets, confidential business information, goodwill, commercial reputation, customer contacts, or customer relationships. Plaintiff has adduced no evidence that Mr. Corum ever was privy to trade secrets during his employment with it. At the February 24 hearing, Mr. Ross testified that Mr. Corum was made privy to parts of plaintiff's building that he would not have been given access to if he had refused to sign the agreement. But plaintiff has not produced any evidence suggesting that this access provided Mr. Corum with any trade secrets. Indeed, Mr. Ross testified that he was not aware of Mr. Corum downloading or otherwise taking information from plaintiff when he left.

Similarly, plaintiff has adduced no evidence that enforcing the agreement here protects business interests such as customer contacts and relationships. At the February 24 hearing, Mr.

Ross testified that law enforcement officers dominated the market for body cameras. And plaintiff asserts that Mr. Corum works primarily with law enforcement offices in his role at TASER. But plaintiff has adduced zero evidence that Mr. Corum developed special relationships with law enforcement clients while working for plaintiff that he later has used in his position at TASER. To the contrary, Mr. Corum testified unequivocally that he works exclusively with plaintiff's commercial clients. Mr. Corum also testified that he works exclusively for law enforcement clients at TASER. And, Mr. Corum testified that the sales role he performed for plaintiff is completely different from the technician role he performs for TASER.[5] Plaintiff has adduced no evidence to dispute that proposition.

But, plaintiff has asserted that Mr. Corum received special training on all its devices during his tenure there. Indeed, Mr. Ross testified that, at the start of his employment, Mr. Corum received basic training about how plaintiff's products worked. Mr. Corum does not dispute this. In his Opposition, Mr. Corum contends he received "approximately two weeks of general training at the outset of his employment." Doc. 7 at 2.

"In determining whether an employer had a legitimate business purpose in specialized training provided to an employee to support a restrictive covenant, courts have looked closely at the type of training provided by the employer." *Ristow*, 94 P.3d 724 at 727. In *Ristow*, the Kansas Court of Appeals affirmed a district court's decision granting summary judgment for Kimberly Ristow after her employer, Allen, Gibbs & Houlik, L.C., attempted to enforce a noncompetition clause in its employment contract. *Id.* at 725. The noncompetition clause prohibited Ms. Ristow from accepting any position "with any client or center of influence of the Employer, or Koch Industries, Inc. and its affiliated companies." *Id.* Apparently, this clause was

---

[5]    In his declaration, Mr. Lincks asserts that Mr. Corum does not generate sales leads or solicit prospective clients in his role at Taser. Doc. 7-2 at 3.

added to employee contracts to address employees lured away by three specific competitors of Ms. Ristow's former employer. *Id.* But, the court of appeals concluded that this portion of the agreement was unenforceable, in part, because it did not protect legitimate business interests. *Id.* at 728.

After examining the record, the court of appeals agreed with the district court that Ms. Ristow "received periodic training" to keep her up to date in her field, but that neither "her duties nor her training appear[ed] to be out of the ordinary or unique." *Id.* at 728. The court concluded that the training and knowledge provided to Ms. Ristow did not "constitute a legitimate business purpose to such an extent" that it supported the restrictions found in the covenant. *Id.* at 728. The court of appeals affirmed the district court's decision finding it was unreasonable to enforce the covenant not to compete, "quite simply" because Ms. Ristow had "no legitimate business interest" to enforce. *Id.* And, the court of appeals noted, enforcing the clause would prevent Ms. Ristow from working almost anywhere because of the scope of the agreement. *Id.*

Applying *Ristow* to the facts here, plaintiff has adduced no evidence that the training Mr. Corum received was out of the ordinary or unique. Plaintiff asserts Mr. Corum was made privy to firmware that drives plaintiff's digital products now competing with TASER's prodcuts. Doc. 17 at 15. And plaintiff contends Mr. Corum helped "troubleshoot" digital products that TASER now rivals. But plaintiff has not shown how this general training and troubleshooting constitutes a legitimate business purpose to the extent that is supported by the restrictions in the agreement. Plaintiff has not demonstrated that Mr. Corum received training that might give TASER an unfair advantage in the marketplace, let alone that Mr. Corum could use his training to provide TASER with an unfair advantage.

Finally, also like the covenant in *Ristow*, the agreement prevents Mr. Corum from working almost anywhere. The agreement provides that during the employee's employment, and for two years afterward, the employee will not "own, manage, operate, control or have any interest . . . or in any way assist any person or entity in the conduct of any business or enterprise which competes with the digital and electronic products of Digital Ally." Doc. 8 at 4. The agreement also provides that the employee will not "[d]irectly or indirectly solicit or divert, or attempt to solicit or divert, any customer, clients, or accounts of Digital Ally" or "[d]irectly or indirectly use or disclose to any person, firm, or corporation, the names or addresses of any of the customers, clients or accounts of Digital Ally." *Id.* Like the covenant in *Ristow*, enforcing the agreement here would limit Mr. Corum's employment opportunities more than "necessary to protect" plaintiff's interests. The agreement here prevents Mr. Corum from working in any capacity for any company who one might consider plaintiff's competitor.

In sum, the breadth of plaintiff's employment agreement here does not protect its legitimate business interests. This factor thus weighs against plaintiff.

### ii. Undue Burden

To determine whether a covenant not to compete imposes an undue burden on the employee, Kansas courts examine the time and territorial limits contained in the agreement. *See Wichita Clinic*, 185 P.3d at 955; *see also Caring Hearts Pers. Home Servs., Inc. v. Hobley*, 130 P.3d 1215, 1222–23 (Kan. Ct. App. 2006).

Mr. Corum contends the agreement places an undue burden on him because it is overbroad. The agreement provides that for two years after Mr. Corum's employment, Mr. Corum will not "directly or indirectly . . . act as an . . . employee . . . or in any way assist any person or entity in the conduct of any business or enterprise which competes with the digital and

electronic products of Digital Ally." Doc. 1-1 at 3–4. Mr. Corum contends that this restriction is too broad because it contains no limits on the types of services Mr. Corum can perform or the categories of clients who could employ him. As written, the agreement prevents Mr. Corum from interacting in any way with plaintiff's competitors. [6]

Plaintiff asserts that the agreement does not pose an undue burden on Mr. Corum because he could work elsewhere. Plaintiff relies on *Weber v. Tillman* for the proposition that, in the face of a restrictive covenant, as long as a former employee can still practice their profession anywhere and at any time without a breach, then the covenant does not pose an undue burden on the employee. Doc. 17 at 17. But this misapprehends *Tillman*'s holding.

In *Tillman*, the Kansas Supreme Court held that the restrictive covenant at issue there did not pose an undue burden on the respondent because it did not prohibit him from practicing dermatology altogether, but only in a limited geographical territory. *Tillman*, 913 P.2d at 91. Also, the *Tillman* restrictive covenant did not prohibit Dr. Tillman from practicing other types of medicine in the limited territory. *Id.* In contrast, the agreement at issue here is not limited by territory or service. The agreement, as it is written, prohibits Mr. Corum from performing for two years any type of service for any business or entity which could be considered plaintiff's competitor. This is far broader than the covenant in *Tillman*, and restricts Mr. Corum to seeking jobs in a completely different market.

In sum, enforcing the agreement would place an undue burden on Mr. Corum. This factor thus weighs against plaintiff.

---

[6]       In its Motion, plaintiff apparently asserts that it only seeks to enforce the restriction to plaintiff's customers within a 50 mile radius of plaintiff's four showrooms in Kansas, Missouri, and Florida. Doc. 5 at 17. But this characterization ignores the words in the agreement. The agreement plainly restricts Mr. Corum from working for "any business or enterprise which competes with the digital and electronic products of Digital Ally." Doc. 1-1 at 3–4.

### iii. Public Welfare

Mr. Corum contends the agreement would injure the public welfare because public policy disfavors restraint on trade. Plaintiff asserts, in turn, that public policy favors in upholding enforceable contracts. In *Tillman*, the Kansas Supreme Court discussed tension between these two interests: "Although restrictive provisions in contracts of employment must be reasonable and not such as to contravene the public welfare, the paramount public policy is that freedom to contract is not to be interfered with lightly." *Id.* at 96. The court then weighed the potential injury to the public that might arise from a shortage of dermatologists in Hays, Kansas, against the freedom to contract. *Id.* at 93–95. The court held that because Dr. Tillman voluntarily and knowingly signed the employment contract, this factor weighed against him. *Id.*

Here, Mr. Corum voluntarily and knowingly signed the agreement. And, Kansas courts have made it clear that freedom to contract is a paramount public policy. This factor thus favors plaintiff.

### iv. Time and Territorial Limits

Finally, Mr. Corum contends the geographic scope of the agreement is too far reaching because it is not limited by territory. However, it is limited in time, as Mr. Corum is only prohibited from working for plaintiff's competitors for two years. In *Tillman*, the Kansas Supreme Court upheld a 30-mile radius limitation for a two year period. *Id.* at 90.

The two-year limitation in this case is reasonable under Kansas law, but whether the expansive geographical scope is reasonable is another question. In *Duarte*, our court determined that a world-wide restriction is not patently unreasonable, but noted that no Kansas cases extend a covenant not to compete so far. *Duarte*, 519 F. Supp. 2d at 1153–54.

In sum, it is unclear whether Kansas courts would enforce the time and territorial limits of this agreement. This factor thus is neutral.

v. Conclusion for Reasonableness

Because plaintiff seeks a mandatory injunction, it must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Duarte*, 519 F. Supp. 2d at 1150. Weighing the four factors that Kansas courts consider, two favor Mr. Corum, one favors plaintiff, and one is neutral. Under the heightened standard, plaintiff has not carried its burden to demonstrate a likelihood of success in proving that the agreement is reasonable.

### 2. Mr. Corum's Breach

According to the terms of the agreement, Mr. Corum is restricted from "act[ing] as an . . . employee . . . of . . any business or enterprise which competes with the digital and electronic products of Digital Ally." Doc. 8 at 4. Mr. Corum currently works for TASER, which plaintiff calls its "sworn enemy." Doc. 17 at 17. And plaintiff asserts TASER competes with plaintiff in the body camera market, citing the patent infringement lawsuit as evidence. Plaintiff has thus carried its burden to show a likelihood of success in proving that Mr. Corum breached the agreement.

### 3. Damages to Plaintiff Caused by Mr. Corum's Breach

The court next considers whether plaintiff has suffered damages caused by Mr. Corum's breach. Neither party addresses this element in its briefing. But, at the February 24 hearing, Mr. Ross testified that plaintiff's employees have been contacted by TASER. And, Mr. Ross testified that technology often changes dramatically, so having a head start on new technology matters a great deal to the success of your business.

But as discussed above, the fact that TASER is plaintiff's competitor in the body camera market, without more, is not evidence that plaintiff suffered damages when Mr. Corum breached the agreement.  Plaintiff has adduced no evidence connecting Mr. Corum's work with TASER to any of the patents at issue in the pending litigation.  Nor has plaintiff produced any evidence suggesting that Mr. Corum possesses trade secrets or confidential information that he unfairly could use to plaintiff's disadvantage in the future.  Plaintiff thus has failed to carry its burden to show a likelihood of success in that it suffered damages from Mr. Corum's breach.

In sum, plaintiff has not demonstrated a likelihood of success on the merits, especially not under the heightened standard required for a mandatory injunction.

## IV.     Conclusion

Weighing all the factors together, the balance tips decidedly in Mr. Corum's favor. Despite the public interest in upholding contracts, plaintiff has not demonstrated that a Kansas court likely would enforce the contract.  And, by failing to demonstrate a likelihood of success on the merits, or that the balance of harms favors entering an injunction, the court finds that plaintiff has failed to carry its burden for a preliminary injunction to issue.  Plaintiff's Motion is thus denied.

While the court has decided to deny plaintiff the interim relief it requests, the court is mindful that its decision on a Rule 65(a) motion is a limited one.  That is, the court merely has decided that plaintiff has failed to sustain the burden imposed on a party who seeks "to preserve the relative positions of the parties until a trial on the merits can be held."  *Camenisch*, 451 U.S. at 395.  When it denies relief of that nature, the court recognizes that it should do its part to provide access—consistent with the parties' substantive rights—to an expedited trial on the merits.  Consequently, the court order the parties:  (a) to confer with one another as soon as

practicable about the subjects identified in Fed. R. Civ. P. 26(f)(2) and (3); and (b) to request that Judge Rushfelt schedule and conduct a Scheduling Conference of the nature contemplated with Fed. R. Civ. P 16(b).

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Digital Ally's Motion for Preliminary Injunction (Doc. 5) is denied.

**THE PARTIES ARE FURTHER ORDERED:** (a) to confer with one another as soon as practicable about the topics identified in Fed. R. Civ. P. 26(f)(2) and (3); and (b) to request that Judge Rushfelt schedule and conduct a Scheduling Conference of the nature contemplated by Fed. R. Civ. P 16(b).

**IT IS SO ORDERED.**

**Dated this 28th day of April, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**　　　　　　　　
**Daniel D. Crabtree**
**United States District Judge**